# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **KARLA SAUNDERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 11-486 (RMC)** |
| ) | |
| **LINDA McMAHON,** ) | |
| **Administrator, Small Business** ) | |
| **Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## OPINION

Karla Saunders sued the Small Business Administration (SBA), alleging

employment discrimination based on her gender and retaliation for her protected activities. After

a four-and-a-half week trial, the jury found that SBA had retaliated against Ms. Saunders when it

failed to interview her for her former position and cancelled a related vacancy announcement

(Claim Three), and when it terminated her employment in 2014 (Claim Eight(b)).[1] The jury was

unable to agree on Claim Two, which alleged retaliation behind the 2009 reassignment of Ms.

Saunders to the SBA Office of Faith Based and Community Initiatives. All other claims were

found by the jury to be without merit, or were dismissed by the Court for lack of evidence. *See*

3/22/2017 Minute Entry; Verdict Form [Dkt. 137]. The jury awarded Ms. Saunders $52,500 in

damages. *See* Verdict Form.

SBA now moves for Renewed Judgment as a Matter of Law on Claim Two, and

Judgment as a Matter of Law on Claim Eight(b). Ms. Saunders has filed a Motion for a New

_____

[1] Claim numbers are those used in the Verdict Form [Dkt. 137].

Trial on Claim Two. For the reasons below, the Court will grant SBA's motion for judgment as a matter of law on Claim Two, deny Ms. Saunders's motion, and deny SBA's motion on Claim Eight(b).

## I. FACTUAL BACKGROUND

### A. Background to Litigated Claims

The Court provides a brief summary of Ms. Saunders's career at SBA to put the contested matters in context. Karla Saunders joined SBA in 2005, coming from the Department of Labor (DOL), where she had most recently been a program specialist at the Occupational Safety and Health Administration. Richard Brechbiel, Chief Human Capital Officer at SBA until November 2, 2007, *see* 2/22/17 Tr. at Stipulation (Stip.) 12, encouraged her to join SBA as Chief of the Training and Benefits Division in the SBA Office of Human Capital. *See* Saunders, 2/22/17 Tr. at 37.[2] She performed as "the training officer for the entire agency." *Id.* At SBA, Mr. Brechbiel quickly promoted her from a GS-14 to a GS-15 pay grade, which is the top career grade at SBA that is below the Senior Executive Service. *See* Civil Service Reform Act of 1978, 5 U.S.C. §§ 1101 *et seq.*

Ms. Saunders's retaliation claim principally relies upon her involvement in equal employment opportunity (EEO) enforcement in 2007. In 2006, a coworker named Janice Chiverton charged that Mr. Brechbiel had discriminatorily failed to promote her. *See* Stip. 17. Ms. Saunders provided affidavit testimony supporting Ms. Chiverton's complaint in late 2006 and, on January 3, 2007, Ms. Saunders gave deposition testimony. *See* Stip. 17-19. Further,

---

[2] Throughout this Opinion, references to Stipulations read into evidence during the February 22, 2017 morning session of Ms. Saunders's trial are cited as "Stip. [number]." Other references to the trial transcripts are cited according to the following format: [Witness], [Date] [a.m. or p.m.] Tr. at [page number]. The 2/22/17 Transcript is not divided into separate documents for the morning and afternoon (a.m. and p.m.) sessions.

"[o]n April 9th, 2007 [Ms. Saunders] and two other SBA employees signed a request for intervention expressing concerns about the conduct and management practices of Richard Brechbiel." *See* 2/22/17 Tr. at 92 (unnumbered stipulation). On March 15, 2007, Ms. Saunders contacted an EEO counselor to complain that Mr. Brechbiel had discriminated and retaliated against her due to this protected activity. *See* Stip. 20; *see also* Saunders, 3/1/17 a.m. Tr. at 7 (recalling the dates of the EEO complaint and request for intervention in March and April 2007). On May 4, 2007, Ms. Saunders sent an email to Mr. Brechbiel, copying other SBA officers, alleging retaliation due to her testimony in the Chiverton case. On July 6, 2007, Ms. Saunders filed a formal EEO charge against SBA. Ms. Saunders traces the post-Chiverton alleged discrimination to her support of Ms. Chiverton. In the Chiverton case, Ms. Saunders was asked by an EEO investigator "did I know that Dick Brechbiel and Sharon Petrell, Sharon Brown-Petrell if they were in a romantic relationship. I answered honestly yes. . . . Dick Brechbiel got mad because I told the truth and that's when the whole abusive beat down for the last eight years has taken place." Saunders, 3/1/17 a.m. Tr. at 19. In September 2010, an Administrative Judge of the Equal Employment Opportunity Commission (EEOC) determined, after a hearing, that no discrimination or retaliation against Ms. Saunders had occurred. Stip. 24.

As Chief of Training and Benefits, Ms. Saunders reported to the Chief Human Capital Officer (CHCO), a position held by Mr. Brechbiel at the time Ms. Saunders was hired, and subsequently held by Napoleon Avery from November 2007 until December 2009, Kevin Mahoney from December 2009 until March 2013, and Bridget Bean for all relevant times after that. *See* Stip. 9, 12; Bean, 3/8/17 p.m. Tr. at 40.

Ms. Saunders was not a completely successful supervisor. According to Mr. Mahoney, "Karla was the only [supervisor] who had people who worked for her who eventually

came to me and asked to be reassigned. As a matter of fact, all seven of her employees at one

time or another came to me and asked to be reassigned." Mahoney, 3/6/17 a.m. Tr. at 67. In her

trial testimony, Ms. Saunders denied that she mistreated any employee, predominately with

simple "no" answers to her counsel's questions. *See* Saunders, 2/23/17 p.m. Tr. at 48-56;

Saunders, 2/27/17 a.m. Tr. at 31-37.

Ms. Saunders was detailed by SBA to DOL from February 11, 2008 to July 30,

2008. *See* Stip. 13-14. She was then detailed to the Office of Entrepreneurial Development,

within SBA, from August 11, 2008 to May 10, 2009, after which she was not returned to her

prior position as Chief of Training and Benefits. *See* Stip. 16. Instead, she was assigned to the

Office of Faith Based and Community Initiatives (the Faith Based Office), with the title of

Senior Advisor and with the same salary grade, GS-15, and benefits as her prior position. Ms.

Saunders claims that this reassignment was a retaliatory act.

In January 2010, Ms. Saunders amended one of her pending EEO complaints to

include new allegations that SBA had retaliated against her by cancelling a vacancy

announcement for her former position as SBA's Chief of Training and Benefits, thereby

preventing her from applying for the position. *See* Sixth Am. Compl. ¶ 83 [Dkt. 92]. A few

months later, in April 2010, an investigator with the U.S. Office of Special Counsel (OSC)

notified Ms. Saunders that SBA had orally agreed to allow Ms. Saunders to return to her former

position. *See id.* at ¶ 85.[3] Ms. Saunders again became Chief of Training and Benefits in June

---

[3] "The U.S. Office of Special Counsel (OSC) is an independent federal investigative and
prosecutorial agency. [Its] basic authorities come from four federal statutes: the Civil Service
Reform Act [5 U.S.C. §§ 1101-05], the Whistleblower Protection Act [5 U.S.C. §§ 1201 *et seq.*],
the Hatch Act [5 U.S.C. §§ 1501-08, 7321-26], and the Uniformed Services Employment and
Reemployment Rights Act (USERRA) [38 U.S.C. §§ 4301-35]." U.S. Office of Special
Counsel, What We Do, https://osc.gov/Pages/WhatWeDo.aspx (last visited Mar. 5, 2018). Ms.
Saunders was covered by the Civil Service Reform Act.

2010; by this time then-CHCO Kevin Mahoney had reassigned various human-resources specialists to a different place in the organization so that they no longer reported to Ms. Saunders's position. *See id.* at ¶¶ 86-88; *see also* Mahoney, 3/6/17 a.m. Tr. at 67 (referencing additional employee reassignments when Mahoney reorganized the Office of Human Capital at the end of 2011 and beginning of 2012). Ms. Saunders thereafter complained of a lack of staff support and other discriminatory treatment by SBA.

In 2014, then-CHCO Bridget Bean recommended Ms. Saunders's discharge, and Chief Operating Officer (COO) Paul Christy sustained the recommendation. Ms. Saunders had planned to retire upon her eligible date in August 2014; however, Mr. Christy decided to discharge her on June 26, 2014, two months shy of her retirement-eligible date. OSC obtained a stay of her discharge from the Merit Systems Protection Board (MSPB) and Ms. Saunders was reinstated. She voluntarily retired after she became eligible.

## B. Claim Two – Reassignment to the Office of Faith Based and Community Initiatives

As now relevant, Ms. Saunders alleged at trial that SBA had intentionally retaliated against her in 2009 for her participation in protected activity in 2007 by reassigning her from her position as Chief of Training and Benefits to the position of Senior Advisor in the Faith Based Office. *See* Sixth Am. Compl. ¶ 156(a); Verdict Form, Claim Two. Ms. Saunders amended the focus of this Claim at the end of trial, arguing that SBA retaliated against her by changing its offer of a voluntary placement as Senior Advisor into a mandatory reassignment on pain of discharge if she refused, only after she advised managers of her 2007 EEO activity.

A little background is helpful. Soon after Barack Obama became President on January 20, 2009, his Administration announced its intention to reinvigorate a faith-based initiative by Executive Branch agencies that had been started under the prior administration of

former President George W. Bush but now lay quiescent without staffing.  It was thought that SBA could particularly assist in the Administration's efforts to recover from the economic collapse in 2008 by outreach to faith and community leaders.  *See* Pickett, 3/2/17 a.m. Tr. at 48 ("[T]he President felt there was a strong role for SBA [in the Faith Based Office] because one of his four objectives for that office was economic recovery and stability within the country and small business was a huge piece of that.  So [the White House] also felt that that was very key to have us involved.  There were also several other agencies that were also involved.").

While the Obama White House selected its Cabinet Officers and political appointees requiring Senate confirmation, it sent liaisons and appointees not requiring confirmation to the departments and agencies.  *See, e.g.*, *id.* at 43, 54 (discussing hiring appointees and working with those in the White House liaison roles).  Penny Pickett was an appointee from the Obama White House, who later became Chief of the SBA Office of Entrepreneurial Development (OED).  Ana Ma joined SBA on February 9, 2009 as the Chief of Staff to the incoming Administrator Karen Mills, who awaited Senate confirmation.  Career SBA manager Darryl Hairston, who was Associate Administrator for Management and Administration, became Acting Administrator from the date of the Inauguration until Ms. Mills's confirmation on April 6, 2009.  *See* Stip. 8, 12.

Ms. Pickett "was the first one in the office [from the new administration, on] the first day of President Obama's administration.  [Darryl] Hairston was designated as the [acting] administrator."  Pickett, 3/1/17 a.m. Tr. at 59.  From meetings at the White House, Ms. Pickett understood that "President Obama said . . . he wanted to get [the Faith Based Office] up and running very quickly because it was important to the President."  Pickett, 3/1/17 p.m. Tr. at 61.  "There was some urgency, [the SBA] was being encouraged by the White House to do it very

quickly." Pickett, 3/2/17 a.m. Tr. at 30. During "general discussions" at SBA about re-starting the Faith Based Office, Ms. Pickett "was told that there was an employee who had some very unique qualifications that might be able to fit the position":

> I learned that she had completed an assignment in another department [within SBA], that she had completed all her work in Entrepreneurial Development, she had no outstanding deliverables that were still there, and that she had qualifications that met the job that I was trying to ask her to serve in.

Pickett, 3/1/17 p.m. Tr. at 61, 64. Ms. Pickett was told that Ms. Saunders "had majored in religious studies in college" and "had the training skills" required for the job. Pickett, 3/2/17 a.m. Tr. at 20. She could not remember who had mentioned Ms. Saunders as a highly qualified candidate for the position. Pickett, 3/1/17 p.m. Tr. at 62. However, Ms. Pickett testified that she "really wanted to recruit [Ms. Saunders] to this position [in the Faith Based Office] because it was a high visibility White House initiative that the President really wanted to follow through on." *Id.* At that time, she did not know that Ms. Saunders had previously served as Chief of the Training and Benefits Division. *See* Pickett, 3/1/17 p.m. Tr. at 62. The reassignment involved no change in Ms. Saunders's pay grade, salary, or benefits. *See* Saunders, 3/1/17 a.m. Tr. at 28-29.

In March 2009, Ms. Pickett and Ms. Ma went to Mr. Hairston to talk about a placement for Ms. Saunders at the conclusion of her detail at OED. He "told them that they should go back and do a little bit of research and come back to me with a recommendation about where they thought it would be appropriate to place her." Hairston, 3/7/17 a.m. Tr. at 43. When Mses. Ma and Pickett returned with a recommendation that Ms. Saunders be placed in the Faith Based Office, Mr. Hairston "authorized the decision for Ms. Saunders to be placed in that office based on the recommendation of the chief of staff [Ms. Ma] and the senior advisor [Ms.

Pickett]," relying "solely on their recommendation." *Id.* at 40; *see also* Jt. Ex. 43 (indicating that

Mr. Hairston signed the Standard Form 52, or SF-52, on April 2, 2009, initiating the

reassignment of Ms. Saunders to the Faith Based Office).

Ms. Pickett explained the kinds of duties that she anticipated the Senior Advisor

in the Faith Based Office would perform:

> As we envisioned this position she would need to work through Faith
> Based and Community based [sic] organizations to set up training. And
> in setting up training she would in essence train the people in these
> organizations to train the trainers is really what we were looking at as a
> two step thing.
> . . . .
> She was very qualified for what we, how we envisioned this office to be.
> We also felt that she had done some rotations in the [SBA] so she
> understood what was available for entrepreneur development and all of
> those small business development centers, women's business centers, so
> she had a good road map of what the agency could and couldn't do and
> that was the kind of information that needed to go through these
> organizations. . . . The job was [whatever] they wanted to create [in] the
> position.

Pickett, 3/2/17 a.m. Tr. at 20-21; *see also id.* at 63 ("In this economic situation [after the

financial crisis in 2008] it was a wide open—they were free to create this position and to deliver

services to any place in the country as their imaginations and their abilities took them. It was an

open discussion. . . . [I]t was a very entrepreneurial opportunity to say here is a mission. How

can you best fulfill it so that you meet, you help the community."). Chief of Staff Ana Ma, the

top political appointee at SBA at the time, testified, "[m]y understanding of the office [was that]

it was a White House driven initiative. They wanted to revamp the Office of Faith Based

Initiatives within each of the departments across the federal government." Ma, 3/2/17 a.m. Tr. at

75. Ms. Ma "understood [that Ms. Saunders had a] background in divinity" and "because of her

experience and knowledge of the SBA in[n]erworkings," Ms. Saunders would be qualified for

the position as Senior Advisor in the Faith Based Office.  *Id.* at 78.[4]  "I knew it was important.  I knew it was urgent for us to have a point person within the building."  Ma, 3/6/17 a.m. Tr. at 17.

As Ms. Pickett recalled,

> it seemed to be widely known through the agency we were looking, that this office had a high visibility with President Obama. . . .  I had gone to a meeting at the White House, was getting ready to meet with Karla [and] at least two or three other people did approach me . . . to ask if they could be considered.

Pickett, 3/2/17 a.m. Tr. at 27-28.[5]  However, Ms. Pickett told other employees that she had a candidate and only if that person declined would she be considering others for the job.  *Id.* at 28.

---

[4] The position description, presented to Ms. Saunders on May 4, 2009 when she was notified that she would be administratively reassigned, stated:

- "[T]he incumbent performs independently without instruction and is responsible for presenting the assistant administrator for Faith Based and Community Initiatives with policy recommendations which may be specific or in the form of alternative courses of action."  Jt. Ex. 43; Saunders, 3/1/17 a.m. Tr. at 31.
- "Coordinates a comprehensive agency effort to incorporate Faith Based and other community organizations and agency programs and initiative[s] to the fullest extent possible."  Saunders, 3/1/17 a.m. Tr. at 33.
- "Independently plans, designs, carries out major programs and projects with minimal supervision and oversight."  *Id.* at 33-34.

Despite the breadth of responsibility and initiative called for in the position description and her position as a GS-15, Ms. Saunders testified she could do nothing without specific direction.  *See* Saunders, 3/1/17 p.m. Tr. at 19 ("Q. There is nothing you could have done [in the Faith Based Office] without someone telling you to call a pastor?  A. I believe that's correct, sir.").  Because the head of the Office was a political appointee awaiting appointment, she had no one to tell her what to do and she thought it was a "fake job."  *Id.*

[5] The Faith Based Office came to the fore when Josh Dubois, who was heading the effort within the White House, met with Chief of Staff Ana Ma and Ms. Pickett about it.  *See* Pickett, 3/2/17 a.m. Tr. at 46-48.

With a "very short timeline" in which to find a senior advisor, Ms. Pickett did not engage in a traditionally competitive selection. *Id.*[6]

Ms. Pickett first talked informally with Ms. Saunders about the new position. Saunders, 2/22/17 Tr. at 57-58 (Ms. Pickett "said she had a position for me that she would like me to consider in the Office of Faith Based and Community Initiatives. She talked a little bit about the job. . . ."). On April 2, 2009, Mses. Pickett and Ma met with Ms. Saunders to offer her the position of GS-15 Senior Advisor in the Faith Based Office. Ms. Pickett testified that "Ms. Saunders said she would be honored to work in this way." Pickett, 3/2/17 a.m. Tr. at 19-20. In contrast, Ms. Saunders testified that she "indicated to [Ms. Pickett and Ms. Ma] that [she] felt . . . retaliated against because [she] had filed an EEO complaint." Saunders, 2/22/17 Tr. at 58. On cross-examination, she said: "The conversation [on April 2, 2009] was I felt that my being reassigned out of my job as the training officer was retaliation for me having filed an EEO complaint against Mr. Brechbiel and giving the letter requesting intervention to the [A]dministrator [in 2007]." Saunders, 3/1/17 a.m. Tr. at 8. Despite any concerns she may have had, Ms. Saunders accepted the offer and, when testifying about the interaction, did not deny that she told Mses. Pickett and Ma that she felt honored by the offer. *See id.*; *see also id.* at 35 (discussing Ms. Saunders's email of April 2, 2009 to Holly Schick at OED, which, according to

---

[6] Ms. Pickett testified that there was "already talk at the White House of an international Muslim summit coming within a few months and that the Faith Based [O]ffice would be one of the four organizing agencies for that huge initiative. It was an international conference that actually did take place at the Reagan Center." Pickett, 3/2/17 a.m. Tr. at 29-30. She added that President Obama wanted to get the Faith Based Office "off the ground because he felt small business was a key, played a key role in the recovery [from the financial collapse in 2008]. So we were trying to move it as quickly as possible so that when" the political appointee who would head the Faith Based Office joined SBA, Ms. Saunders "could fill him in on how SBA worked and programs and what had been done before, so they could really hit the ground running." *Id.* at 30.

Ms. Saunders's recollection, stated: "Hi Holly. Met with Penny and Ana today and I was offered the position as we discussed. I accepted, so effective Monday assigned to that office."). Ms. Saunders testified that she "felt pressured and didn't want to have any trouble, so [she] initially accepted the job." *Id.* at 39.

Also on April 2, 2009, after the meeting with Mses. Pickett and Ma, Ms. Saunders called Ms. Pickett and left a voice message expressing concern about the new position. Ms. Saunders testified that she retracted her acceptance in the voice message, and that she told Ms. Pickett that she felt she was being retaliated against. *See* Saunders, 2/22/17 Tr. at 60-61. According to Ms. Saunders's trial testimony, she said during the meeting that she had filed an EEO complaint and submitted a request for intervention to the Administrator. *See id.* at 105-06 ("When I met with [Mses. Ma and Pickett on April 2, 2009] I said that I, when I told them that I had filed an EEO complaint and I had submitted a letter along with my other co-workers for a request for an intervention."); *see also* Stip. 19.[7] She followed up with an email to Ms. Pickett four days later, on April 6, 2009, referencing the voice message and her concerns about the reassignment, and requesting a follow-up meeting "[b]efore[] I formally accept this re-

---

[7] Prior to her testimony at trial, Ms. Saunders had never said that she complained of retaliation at the April 2, 2009 meeting with Mses. Pickett and Ma. *See, e.g.*, Saunders, 3/1/17 a.m. Tr. at 87 (discussing the April 2, 2009 email in which Ms. Saunders reported to Ms. Schick that she had accepted the new position, and Ms. Schick responded to congratulate her); Tr. at 91; *id.* at 94, 96-97, 101-05 (discussing Ms. Saunders's previous testimony in interrogatories, her affidavit in an EEO case, and her deposition testimony, none of which included the suggestion that she had expressed any concerns of retaliation to Ms. Ma or Ms. Pickett on April 2, 2009). Shown these documents, Ms. Saunders agreed that "[b]ased on what you read and showed me, I didn't" mention retaliation on April 2, 2009. *Id.* at 105. These confusions will be resolved, for purposes of ruling on SBA's motion, by crediting Ms. Saunders's trial testimony, to the effect that she retracted her acceptance by voice mail to Ms. Pickett soon after the April 2, 2009 meeting and mentioned retaliation at the time. *See, e.g.*, *Beyene v. Hilton Hotels Corp.*, 958 F. Supp. 2d 247, 249 (D.D.C. 2013) (noting that the Court, in deciding a motion for judgment as a matter of law, does not make credibility determinations or weigh the evidence).

assignment." *See* Pl.'s Ex. 29; Saunders, 2/22/17 Tr. at 62. However, because Ms. Saunders had already accepted the position during the April 2, 2009 meeting, on that same day, Mr. "Hairston and [Ms.] Ma signed an SF-52 initiating [Ms. Saunders's] reassignment to the newly created position of senior advisor in [the Faith Based Office] effective May 24, 2009." Saunders, 3/1/17 a.m. Tr. at 99 (reading interrogatory response 67); *see also* Jt. Ex. 43 (SF-52 initiating Ms. Saunders's reassignment to the Faith Based Office).

On April 6, 2009, Ms. Pickett sent an email to Ms. Saunders, titled "Confirmation of Change in Assignment," that addressed the concerns about the new job that Ms. Saunders had raised on April 2. *See* Pl.'s Ex. 198 at 2-4; *see also* Def.'s Renewed Motion, Ex. 2 [Dkt. 150-3]. Ms. Pickett described the job positively as "an opportunity to work independently, prepare a summary of work previously done [during the Bush Administration] and prepare proposals for re-energizing the faith based initiatives." Pl.'s Ex. 198. Ms. Saunders responded that she was worried about being reassigned to a non-managerial position because it "has potential negative implications for [her] future career options." *Id*. at 2. In Ms. Pickett's reply, she said, in part: "At the conclusion of our discussion [on April 2, 2009], it appeared that you were going to play a key role in developing policy for an important initiative in the administration. If, as your note indicates, you do not wish to go forward at this time, I certainly understand." *Id.* Ms. Pickett offered to meet again with Ms. Saunders. *Id.*

Before sending her reply to Ms. Saunders, Ms. Pickett sent a draft of the email on April 6, 2009 to Acting Administrator Daryl Hairston and Chief Human Capital Officer Napoleon Avery, requesting: "Please review my response before I reply to this e-mail. Sorry, guys, I tried." Pl.'s Ex. 29B. She explained at trial that she was sending the draft email to

Messrs. Hairston and Avery in case it violated any federal personnel practices, with which she was unfamiliar:

> [When] I put sorry guys, I tried to indicate that [Ms. Saunders] had expressed some hesitation and some reluctance to take the position. I really desperately wanted to recruit her in the position and I felt I had not succeeded in recruiting her to an opportunity that was important to the agency and important to the people at the White House. So sorry guys, I tried. I tried to recruit her and apparently I'm not being successful.
> . . . .
> She had expressed to me some serious concerns about the position which meant if she was waffling back and forth that I wanted to let her know that, and I did say in this [email] note, if you do not wish to go forward at this time, I would certainly understand.

Pickett, 3/2/17 a.m., at 22-23. Responding to Ms. Pickett's draft, Mr. Avery advised by email on April 7, 2009 that SBA had full authority to reassign Ms. Saunders: "Management has the right to reassign an employee from supervisor to non-supervisor." Pl.'s Ex. 29B. On the same day, when Ms. Pickett finalized her draft email and sent it to Ms. Saunders, the email did not specify that Ms. Saunders was not required to take the job. Challenged on cross-examination, Ms. Pickett could not remember the details but thought she may have cut and pasted incorrectly; she pointed out that her final email told Ms. Saunders, "'If[,] as your note indicates[,] you do not wish to go forward at this time I certainly understand.'" Pickett, 3/2/17 a.m. Tr. at 27. At trial, Mr. Avery testified that he had "numerous discussions" with colleagues in or around April 2009 regarding whether Ms. Saunders would be reassigned involuntarily, and that he was unsure when or by whom the decision to do so was ultimately made. Avery, 3/8/17 a.m. Tr. at 45. Ms. Saunders complains the change was discriminatory but does not challenge Mr. Avery's conclusion that SBA could move an employee out of a supervisory role without violating the Civil Service Reform Act.

On April 16, 2009, Ms. Saunders gave Ms. Pickett a packet that contained documentation of her prior 2007 EEO activity.  *See* Saunders, 2/22/17 a.m. Tr. at 63 ("In it was a copy of my, first was a cover letter highlighting how I had been sent on to details in pretty much meaningless jobs and was a copy of my EEO complaint that I had filed against Mr. Brechbiel for testifying for Janice Chiverton and a request for my copy of my intervention that I sent to former Administrator Mr. Preston. . . ."); *see also* Pickett, 3/2/17 a.m. Tr. at 35.  At the time, Ms. Pickett was in a crowded hallway outside her office and about to go into a conference room for a meeting.  *See* Pickett, 3/2/17 a.m. Tr. at 35.  Ms. Saunders testified that she said, "here's the information that I promised I would give to you concerning my belief that I was being retaliated against."  Saunders, 2/22/17 a.m. Tr. at 79-80.  Ms. Saunders asserts that the delivery of this packet of materials informed Ms. Pickett of Ms. Saunders's prior EEO activity, thus supporting her charge that her involuntary reassignment was retaliatory.  Ms. Pickett testified that Ms. Saunders said, "sort of like here, this is for you or here is something, I don't remember specifically."  Pickett, 3/2/17 a.m. Tr. at 35.  Ms. Pickett initially put the packet, unopened, on the corner of her desk and went into her meeting.  At the end of the day, she cleared her desk and put the packet into a file drawer.  *Id.* at 31.  She then forgot about the packet and moved it with her other papers when she became Chief of OED.  *Id.*  Later, in November 2009, an attorney from SBA's General Counsel's Office visited Ms. Pickett to take affidavit testimony to respond to Ms. Saunders's EEO charge and Ms. Pickett remembered the packet; she and counsel retrieved it from her files.  *Id.* at 32 ("[W]e found the envelope.  It was still sealed.  It had never been opened.").  Ms. Pickett further testified that the attorney took the sealed packet with her "[s]o I never looked in the file."  *Id.*

In the afternoon of April 16, 2009, after delivering the EEO packet, Ms. Saunders sent a follow-up email to Ms. Pickett offering to answer any questions concerning it. *See* Pl.'s Ex. 198. Her email did not mention that she had withdrawn her acceptance of the job. *Id.* Ms. Pickett had no recollection of receiving that email and the record shows no response. *See* Pickett, 3/2/17 a.m. Tr. at 31 ("I have to admit I had so many emails I can't say that I read all of my e-mails [sic] or I remember all of my emails, but I don't particularly remember this one."). Asked if Ms. Saunders had told Ms. Pickett at the April 2, 2009 meeting that she would provide such a packet, Ms. Pickett said, "I don't remember that at all. . . . I don't remember her saying that at all." *Id.* at 35.

On May 4, 2009, Ms. Saunders had a second meeting with Ms. Ma at which Ms. Ma gave Ms. Saunders a letter formally reassigning her to the new position in the Faith Based Office. Since the new Administrator, Ms. Mills, had been confirmed on April 6, 2009, Mr. Hairston was no longer Acting Administrator after that date and played no role in these events. *See* Hairston, 3/7/17 a.m. Tr. at 48. According to Ms. Saunders, "[i]n the meeting they came in and s[a]t down and Ms. Ma slid me a folder. In the folder was a letter that stated if, I was being administratively reassigned as an HR specialist to the Office of Faith Based Community Initiatives as a senior advisor and if I didn't take the job, I *would* be removed from federal service." Saunders, 2/22/17 a.m. Tr. at 64 (emphasis added). Ms. Saunders "accepted the administrative reassignment" because she was "fearful I would be unemployed . . . ." *Id.* at 66. In fact, the letter stated: "Be aware that failure to accept this administrative reassignment *could* result in your separation from federal service." *See* Pl.'s Ex. 31 (Notice of Reassignment) [Dkt. 150-2] at 1 (emphasis added). SBA has characterized this sentence as customary language in a letter of administrative reassignment, and notes that no testimony at trial contradicted that

characterization. *See* Reply Opp'n JMOL on Claim 2 [Dkt. 161] at 10. Ms. Saunders signed the Notice of Reassignment eleven days later, on May 15, 2009. *See* Pl.'s Ex. 31 at 2.

After the jury failed to render a verdict on Claim Two, *see* Verdict Form, Ms. Saunders moved for a new trial on Claim Two. Mot. for a New Trial on Claim Two [Dkt. 148]. SBA moved for renewed judgment as a matter of law on Claim Two, Mot. for Judgment as a Matter of Law as to Claim Two (Renewed) [Dkt. 150] (JMOL on Claim 2), and opposed Ms. Saunders's motion for a new trial. Mem. Opp'n Mot. for New Trial [Dkt. 152]. Ms. Saunders opposed SBA's motion for judgment as a matter of law. Mem. Opp'n Mot. Judgment as a Matter of Law as to Claim Two [Dkt. 159] (Mem. Opp'n JMOL on Claim 2). SBA replied. Reply Opp'n Mot. for Judgment as a Matter of Law as to Claim Two [Dkt. 161] (Reply Opp'n JMOL on Claim 2). The motions are ripe.

### C. Claim Eight(b)

Ms. Saunders further alleged at trial that she was intentionally retaliated against by SBA for her participation in protected activity when she was terminated from employment on June 26, 2014. During jury deliberations, on April 4, 2017, the jury sent a note to the Court asking whether it could divide Claim Eight into two questions: was Ms. Saunders retaliated against when (a) SBA issued a Notice of Proposed Removal from federal service, and/or (b) SBA terminated Ms. Saunders from employment on June 26, 2014. Jury Note [Dkt. 119]. With input from the parties, the Court allowed the question to be divided. *See id.* The jury then returned a verdict finding that SBA intentionally retaliated against Ms. Saunders when it terminated her (Claim Eight(b)), but not when it issued a Notice of Proposed Removal (Claim Eight(a)). *See* Verdict Form. The government seeks judgment as a matter of law on Claim Eight(b).

### i. Notice of Proposed Removal

Bridget Bean, SBA Chief Human Capital Officer at the time, sent Ms. Saunders a Notice of Proposal Removal dated April 17, 2014. Jt. Ex. 62, Notice of Proposed Removal [Dkt. 155-3]. The Notice contained four charges justifying Ms. Saunders's removal. The first charge, "Conduct Unbecoming a Supervisor," was based on Ms. Saunders's treatment of Shawn Thompson, Rebecca Archer, Phyllis Brandford, Trisha Christian, and Robert Murray, all of whom resigned after complaining of Ms. Saunders's alleged poor management conduct while she was Chief of Training and Benefits. *Id*. at 1-3. Several of these individuals testified at trial. The second charge, "Failure to Cooperate with an Official Inquiry," was based on findings of an independent contractor retained by SBA to investigate Ms. Saunders's alleged misconduct as part of an official inquiry. *Id.* at 3. Ms. Saunders refused to meet with the contractor without her lawyer present and the report was completed without her input. *Id*. The third charge, "Lack of Candor," was based on Ms. Saunders's objections to giving Mr. Murray a permanent position, which Ms. Bean found "lacked candor as to Mr. Murray's performance and conduct." *Id*. at 3-4. The final charge was for "Retaliation Against an Individual Involved in the EEO Complaint Process." *Id.* at 4. It was based on Ms. Saunders's efforts to prevent Mr. Murray from obtaining a permanent position, after Mr. Murray had filed an EEO charge in 2012 against Ms. Saunders, and her mentioning his EEO charge in several conversations which also indicated a retaliatory motive. *Id*. at 4-5.

Based on the above, Ms. Bean proposed that Ms. Saunders be removed from service, concluding: "Your conduct as a supervisor has been disingenuous. You have intimidated your staff and colleagues with a passive-aggressive management style for the purpose of maintaining control." *Id*. at 6. Separately, on April 17, 2014, Ms. Bean sent Ms.

Saunders a letter informing her that she was being placed on administrative leave with pay. Jt. Ex. 63, Apr. 17, 2014 Letter [Dkt. 155-4] at 1. The letter further stated that "Mr. Paul Christy, Chief Operating Officer, is the deciding official in that matter [of the proposed removal]." *Id.* As indicated above, the jury found that retaliation did not prompt this Notice.

### ii. Termination on June 26, 2014

Before reaching a decision on Ms. Bean's recommendation, COO Christy received written materials from Ms. Saunders, met with her and her counsel for oral responses, and reviewed later documentation provided by Ms. Saunders, including a packet delivered on June 23, 2014, which contained documentation related to Ms. Saunders's EEO complaints. *See* Christy, 3/21/17 a.m. Tr. at 62 (discussing his review of the EEO-complaint-related materials); Jt. Ex. 63 at 1 (referencing the June 23, 2014 packet). On June 26, 2014, COO Christy sent a letter to Ms. Saunders sustaining all charges and removing her from SBA employment. *See* Jt. Ex. 65, Letter of Termination [Dkt. 155-5]. Mr. Christy considered Ms. Saunders's pending application to retire in August 2014 but stated, "it is in the best interest of the Agency to immediately remove [Ms. Saunders] from the SBA and the Federal government in order to promote efficiency of the Agency." *Id.* at 4.[8]

The termination letter referenced Ms. Saunders's EEO activity, which she had brought to Mr. Christy's attention. Mr. Christy testified that he did so to explain that he had reviewed the material, along with everything else, but that it did not affect his decision. *See* Christy, 3/21/17 a.m. Tr. at 62. When asked why he did not allow Ms. Saunders to remain until she could retire, Mr. Christy responded that it was "outside of the job that [he] was required to

---

[8]  Ms. Saunders had decided during the winter of 2013-2014 to retire from SBA when she became eligible in August 2014. *See* Saunders, 2/23/17 p.m. Tr. at 36-37.

do," because his job was "not to mitigate any of the decision" but rather to "comment on the sustainability of the charges" against Ms. Saunders. *Id*. at 83-84.

Ultimately, Ms. Saunders was not terminated. She contacted the Office of Special Counsel, and OSC petitioned the MSPB for a stay order to prevent Ms. Saunders's immediate termination. *See* Saunders, 2/23/17 p.m. Tr. at 43-44. A stay order was issued, preventing her termination for 45 days. *Id.* at 44. Ms. Saunders "came back into the office after the Office of Special Counsel received the stay on [her] termination." Saunders, 2/27/17 a.m. Tr. at 14. During the 45-day period of the stay, Ms. Saunders became eligible to retire and did retire from the SBA. Saunders, 2/23/17 p.m. Tr. at 44-45. The jury found that SBA had retaliated against Ms. Saunders when it terminated her (Claim Eight(b)), and when it announced and subsequently cancelled a vacancy for her former position without interviewing her (Claim Three). *See* Verdict Form. The jury awarded $52,500 in damages. *See id*.

After the jury awarded its verdict in Ms. Saunders's favor on Claim Eight(b), SBA moved for renewed judgment as a matter of law on that claim. Mot. Judgment as a Matter of Law on Claim Eight(b) (Renewed) [Dkt. 155] (JMOL on Claim 8(b)). Ms. Saunders opposed. Opp'n Mot. Judgment as a Matter of Law as to Claim 8(b) [Dkt. 160] (Opp'n JMOL on Claim 8(b)). SBA replied. Reply Opp'n Mot. Judgment as a Matter of Law as to Claim 8(b) [Dkt. 178]. The motion on Claim Eight(b) is ripe.

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law

Under Rule 50 of the Federal Rules of Civil Procedure, after a court denies a motion for judgment as a matter of law at the close of all evidence, the action is submitted to the jury. However, such a motion may be renewed after entry of judgment by the jury, and if no

verdict was returned, the court may, in disposing of the renewed motion, "direct the entry of judgment as a matter of law" or may order a new trial. Fed. R. Civ. P. 50(b). The standard for awarding a motion or renewed motion for judgment is the same as that governing rulings on summary judgment and is only proper if "'viewing the evidence in the light most favorable to the plaintiff and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn.'" *Chanda v. OPM*, 841 F. Supp. 432, 437 (D.D.C. 1993) (quoting *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 827 (D.C. Cir. 1988)). In neither circumstance does a court make credibility determinations or weigh the evidence. *See Beyene v. Hilton Hotels Corp.*, 958 F. Supp. 2d 247, 249 (D.D.C. 2013).

Although judgment as a matter of law is highly disfavored because it "intrudes upon the rightful province of the jury," *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994), it is proper if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for" the nonmoving party. Fed. R. Civ. P. 50(a)(1). If reasonable minds could differ as to the weight of the evidence, a court should not direct a judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

**B.  Motion for a New Trial**

A new trial, pursuant to Rule 59 of the Federal Rules of Civil Procedure, may be granted to "any party" and "on all or some of the issues" in an action in which there has been a trial by jury, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. Rule 59(a)(1). The standard for a new trial is less onerous than one for a motion for a judgment as a matter of law but "'must clearly establish either a manifest error of law or fact or must present newly discovered evidence.'" *Nyman v. Chairman, FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (quoting *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.

1986)).  In considering such a motion, courts are "'mindful of the jury's special function in our legal system and hesitate to disturb its finding.'"  *Id*. (quoting *Lewis v. Elliott*, 628 F. Supp. 512, 516 (D.D.C. 1986)).

**C.  Retaliation Law in Federal Employment**

Under Title VII, it is an "unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  In 1972, Title VII was extended to cover employees of federal agencies in the Executive Branch.  Equal Employment Opportunity Commission Act of 1972, Pub. L. No. 92-261, 86 Stat. 111.

To establish a prima facie retaliation claim, a plaintiff must demonstrate that:  (1) she was engaged in a protected activity; (2) the employer took a materially adverse employment action; and (3) there is a causal connection between the protected activity and the materially adverse action.  *Brown v. Paulson*, 597 F. Supp. 2d 67, 73 (D.D.C. 2009).  For a factfinder to infer causation, there must be evidence that the employer was aware of the protected activity.  *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006).

Retaliatory conduct need not reach the same level of adversity as discriminatory conduct.  *See generally Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010).  "Title VII's substantive [discrimination] provision and its anti-retaliation provision are not coterminous" because the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Steele v. Schafer*, 535 F.3d 689, 695-96 (D.C. Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006))

(internal quotation marks omitted).  Instead of only "affecting the terms, conditions, or privileges of employment," as must a discriminatory adverse action, retaliatory conduct need only "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68).  Nonetheless, this material adversity requires "more than 'those petty slights or minor annoyances that often take place at work and that all employees experience.'"  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N.*, 548 U.S. at 68).

Retaliation claims must be proved according to traditional principles of but-for causation.  *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  This is in contrast to discrimination claims which may be established under a mixed-motive theory.  *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007) (considering arguments under a mixed-motive theory in a claim against the U.S. Attorney General); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (contrasting *Nassar*'s but-for standard in retaliation cases with the more "relaxe[d]" standard in Title VII's mixed-motive discrimination provision, 42 U.S.C. § 2000e-2(m)).

Courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) to retaliation claims.  *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 50 (D.D.C. 2011).  Once a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant "'to articulate some legitimate, nonretaliatory reason' for the adverse action."  *Hampton*, 760 F. Supp. 2d at 50 (quoting *McDonnell Douglas*, 411 U.S. at 802) (internal brackets omitted).  If the defendant does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence."  *Swann v. Office of the Architect of the Capitol*, 185 F. Supp.

3d 136, 142 (D.D.C. 2016) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

"[I]n considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason. . . ."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 511 (1993); *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983)); *see also Swann*, 185 F. Supp. 3d at 142.

### D.  EEO Complaints Before the Merit Systems Protection Board

Under the Civil Service Reform Act of 1978, the MSPB is an agency that has the power to review serious personnel actions against federal employees.  *See Perry v. Merit Sys. Protection Bd.*, 137 S. Ct. 1975, 1977 (2017).  To exhaust her administrative remedies fully prior to filing a Title VII complaint in federal court, a federal employee may appeal to MSPB, either directly or as a challenge to adjudication by her employing agency's EEO office.  *See Morris v. McCarthy*, 825 F.3d 658, 665 (D.C. Cir. 2016) (citing 5 C.F.R. § 1201.154(a); 29 C.F.R. § 1614.302(b)).  MSPB decisions are reviewable in federal district court if they are brought under federal antidiscrimination law.  *See Perry*, 137 S. Ct. at 1977 (citing *Kloeckner v. Solis*, 568 U.S. 41, 46 (2012)).  The OSC is a separate, independent prosecutorial agency that investigates federal employees' claims of prohibited personnel practices and prosecutes them before the MSPB.  *See Morris*, 825 F.3d at 664.

### III. ANALYSIS

#### A. Claim Two – Reassignment to the Office of Faith Based and Community Initiatives

SBA argues that the Supreme Court's decision in *Clark County School District v. Breeden*, 532 U.S. 268 (2001), controls here and that Claim Two should be dismissed as a matter of law. In *Clark County*, a supervisor had contemplated transferring the plaintiff to a new position before becoming aware that the plaintiff had filed an EEO lawsuit. *Id*. at 272. As a result, the Court found that the plaintiff had failed to establish a causal connection between her protected activity and the transfer, and thus could not support a claim of retaliation. The Court held: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines *previously contemplated, though not yet definitively determined*, is no evidence whatever of causality." *Id*. (emphasis added). Importantly, the transfer at issue in *Clark County* was involuntary. In *Cruz v. Kelly*, 241 F. Supp. 3d 107 (D.D.C. 2017), *appeal docketed*, No. 17-5113 (D.C. Cir. May 22, 2017), a colleague on this Court came to the same conclusion. The *Cruz* plaintiff was accused of unprofessional conduct and acting in a demeaning manner to her subordinates. She was given a written warning that indicated she would be transferred to a position with less supervisory responsibility. She was then detailed, and the detail extended, before she was reassigned to a position she thought less desirable; based on an intervening EEO complaint, she charged that the extension of the detail and the reassignment were retaliatory. Judge Richard Leon disagreed because her reassignment was "already in motion" at the time of her protected activity. *Id.* at 114.

SBA asserts that the facts of this case are analogous to *Clark County* and *Cruz*, because Ms. Saunders's reassignment was already underway before those responsible for the

reassignment received information about Ms. Saunders's protected activity. Ms. Saunders relies on two protected activities as the basis for her retaliation claim: (1) the April 2, 2009 meeting with Mses. Pickett and Ma in which, according to Ms. Saunders's trial testimony, she had expressed concern that retaliation was behind the proposed reassignment to the Faith Based Office; and (2) her delivery of a packet to Ms. Pickett on April 16, 2009 containing information regarding her 2007 EEO activity. SBA rightly points out, and the evidence shows, that Ms. Pickett, Ms. Ma, and Mr. Hairston—the three individuals involved in Ms. Saunders's reassignment to the Faith Based Office as of April 2, 2009—were contemplating Ms. Saunders's reassignment *before* the April 2, 2009 meeting. *See* JMOL on Claim 2 at 5. Indeed, Ms. Pickett had declined to talk with other potential candidates for the Faith Based Office because she was in a hurry to fill the job as part of the new Administration's priorities, and she was convinced that Ms. Saunders possessed a unique combination of education and experience. Pickett, 3/2/17 a.m. Tr. at 28-29. Additionally, Mr. Hairston and Ms. Ma signed the SF-52 that reassigned Ms. Saunders on April 2, 2009, the same day as the meeting between Mses. Ma, Pickett, and Saunders at which the job offer was made. Assuming that Ms. Saunders mentioned her 2007 EEO activity at the April 2 meeting, there is no evidence that Mses. Ma and Pickett had any knowledge of it before that time; thus, the proposal to reassign Ms. Saunders to the Faith Based Office could not have been influenced by her 2007 EEO activity.

*Clark County* also controls the analysis of whether Ms. Saunders's delivery of a packet of EEO materials from 2007 to Ms. Pickett on April 16, 2009 could have caused the reassignment. In point of fact, there is no evidence that Ms. Pickett opened the packet or ever read the 2007 EEO documents; even if she had, the SF-52 and undisputed trial evidence shows

that Ms. Saunders's reassignment was already well beyond being merely "contemplated" at that time. *Clark County*, 532 U.S. at 272.

Ms. Saunders argued at trial and argues here that the reassignment to the Faith Based Office was initially offered as a *voluntary* new placement in which she had a choice. She cites the testimonies of Ms. Pickett, Ms. Ma, and Mr. Hairston in support.[9] She contends that it was only after she expressed her concerns over retaliation and delivered the packet of her EEO documents that the reassignment became mandatory. The change from a voluntary to a mandatory reassignment is now the focus of Ms. Saunders's argument that it was a retaliatory action. *See* Mem. Opp'n JMOL on Claim 2 at 1 ("Ms. Saunders established that between May 4 and 15, 2009, the Agency decided to issue a memorandum directing her reassignment (on threat of termination) to the Office of Faith Based Community Initiatives ("OFBCI"), which immediately followed her protected activity on April 2 and 16, 2009.").

The first problem with this argument is that it totally ignores the SF-52 signed by Mr. Hairston and Ms. Ma on April 2, immediately after Ms. Saunders had admittedly *accepted* the new job during the meeting with Mses. Ma and Pickett. Whatever the outside scope of *Clark County*'s meaning of "contemplating," SBA's contemplation of, or intention to, move Ms. Saunders into the Faith Based Office became unassailably clear on April 2, bolstered by the events leading up to the formal offer. *Clark County*, 532 U.S. at 272.

_____

[9] When asked if Ms. Saunders "had the option of saying no on April 2nd," Ms. Ma responded, "Sure, yes." Ma, 3/2/17 p.m. Tr. at 45. In response to the question "was it your understanding at any point that Karla Saunders was required to accept the job or possibly face termination from federal service?" Ms. Pickett stated, "No. . . . I heard nothing like that. I think I would have remembered something that significant." Pickett, 3/2/17 a.m. Tr. at 8. Mr. Hairston testified that he was not involved in any decision regarding whether Ms. Saunders should be reassigned involuntarily, stating "I didn't express any opinions about it." Hairston, 3/7/17 a.m. Tr. at 54.

Ms. Saunders recalled that "[t]he conversation [on April 2] was that my being reassigned out of my job as the training officer was retaliation for me having filed an EEO complaint against Mr. Brechbiel and giving the letter requesting intervention to the [A]dministrator," Saunders, 3/1/17 a.m. Tr. at 8. On April 2, Ms. Saunders indicated only that she had filed an EEO complaint and written to the Administrator, without details. *See* Saunders, 2/22/17 Tr. at 105-06. However, as stated above, Mses. Pickett and Ma could not have retaliated against Ms. Saunders on April 2, because they had no prior knowledge of said EEO activity. Ms. Saunders posits no causative connection between her mention of an EEO complaint against a long-gone and unknown former SBA manager and the job offer, nor any reason for Ms. Pickett or Ms. Ma, who had just arrived at SBA, to harbor retaliatory animus against her on behalf of Mr. Brechbiel. The April 16 delivery of an EEO packet to Ms. Pickett proves no more, in part because Ms. Pickett's testimony that she never opened or read the materials is uncontested. Further, Ms. Saunders fails to connect the alleged retaliation in 2009 by two very new SBA managers to her EEO activity in 2007 concerning a long-departed CHCO. The passage of time between the two events saps the alleged connection of any strength. *See, e.g.*, *Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009) (finding that "far too much time [had] passed to infer a retaliatory motive" where protected activity had occurred eleven months prior to the adverse employee evaluation under consideration).

The question becomes whether, drawing all inferences in favor of Ms. Saunders, "there can be but one reasonable conclusion drawn." *Chanda*, 841 F. Supp. at 437 (quoting *Richardson*, 857 F.2d at 827). During trial, SBA presented three non-retaliatory reasons for why Ms. Saunders was reassigned to the Faith Based Office. First, it was urgent that SBA fill the position in order to participate, with a small number of other agencies, in the outreach program

planned by the White House.  Second, with information on her background, her training experience, and her familiarity with SBA, Ms. Saunders was reportedly a good fit for the position.  Third, there was no vacancy in the Office of Entrepreneurial Development, where her detail was ending, so Ms. Saunders was available to fill another position.  *See* Schick, 3/14/17 p.m. Tr. at 43 (testimony by Ms. Saunders's supervisor at OED that there was no vacancy at OED, so there was a need to find a placement for Ms. Saunders).

Ms. Saunders argues that these reasons were pretexts to hide retaliation, but her arguments fail.  She does not challenge the Obama Administration's hurry to get the SBA Faith Based Office up and operating again, quickly, before its director, a political appointee, arrived.  Instead, she contends that SBA's supposed urgent need to fill the position is undermined by the facts that there was a delay in moving Ms. Saunders to her new office and that "she had nothing to do" once there.  Opp'n to JMOL on Claim 2 at 22.  This argument, however, does not rebut the consistent accounts from Mses. Ma and Pickett that they felt an urgent need to fill the position emanating from the White House.  Ms. Saunders's assertion that she had nothing to do apparently arose from her unwillingness to do anything without a direct boss to order it, not retaliation from Ms. Pickett, who testified that she suggested that Ms. Saunders could review and summarize the work done by the Faith Based Office during the Bush Administration so that she would be prepared to instruct the new director of the Office when he was confirmed.

Ms. Saunders does not dispute that Mses. Pickett and Ma understood, incorrectly, that Ms. Saunders had a background in religious studies and had experience in training and working in different SBA divisions.  *See* Saunders, 3/2/17 a.m. Tr. at 76.  Instead, Ms. Saunders offered her own opinion that she was not qualified to work in the Faith Based Office because she knew nothing about awarding grants (not mentioned by either Ms. Pickett or Ms. Ma) and had a

background in human resources.  *See* Saunders, 2/22/17 Tr. at 61-62.  She also testified that she

had a bachelor's degree in economics and finance and a master's degree in training and

employment development, but not in divinity.  Saunders, 2/22/17 a.m. Tr. at 35.  Ms. Pickett

testified that she had been told that Ms. Saunders had a background in training and had served in

different divisions within SBA, which Ms. Pickett thought made her a good fit for the new

position of senior advisor.  *See* Pickett, 3/2/17 a.m. Tr. at 20.  Ms. Saunders argues that Ms.

Pickett's testimony was contradicted by Ms. Ma, who said that the position may "possibly"

include some training but that training would not be a primary part of the job.  Ma, 3/2/17 a.m.

Tr. at 76.  The Court sees no contradiction in the slightly varying predictions on how the new job

might be developed, inasmuch as it was contemplated by both Mses. Pickett and Ma, and by the

position description, that it had wide-ranging possibilities to be determined.  *See, e.g.*, *Jackson v.

Gonzales*, 496 F.3d 703 (D.C. Cir. 2007) ("[J]ob descriptions are often phrased in general terms,

and employers then make the ultimate hiring decision in light of more specific factors—such as

their strategic priorities and goals at the time . . . among many other factors.  We have said that

courts must not second-guess an employer's initial choice of appropriate qualifications.").

       The context in which Ms. Pickett and Ms. Ma were acting is also undisputed.

Each woman was new to SBA, having parachuted in as Obama appointees immediately after the

Inauguration.  Neither had any prior knowledge of Ms. Saunders's EEO activity.  Both were

inundated with work, filling positions in the agency.  *See, e.g.*, Pickett, 3/2/17 a.m. Tr. at 46

("It's hard to overstate how busy things were."); Ma, 3/6/17 a.m. Tr. at 15-16, 19-20 (testifying

that there were "thousands" of "huge priorit[ies]" for the agency at the time, among them filling

the position to which Ms. Saunders was assigned).  They considered the job in the Faith Based

Office a plum assignment, with the possibility of representing SBA at meetings at the White

House.  *See, e.g.*, Pickett, 3/2/17 a.m. Tr. at 19-20, 50.  The desire to fulfill an Obama

Administration priority with a quick assignment to the Faith Based Office constituted a

legitimate, non-discriminatory reason for Ms. Saunders's selection.

Finally, Ms. Saunders argues that Mr. Hairston's testimony suggests that the lack

of a vacancy at OED was not the reason for reassigning Ms. Saunders, and that knowledge of

Ms. Saunders's prior EEO activity was a factor in the reassignment.  She points to Mr.

Hairston's answer to trial counsel's question:  "So when you said as a consequence of those two

things happening, Ms. Pickett and Ms. Ma decided to reassign Ms. Saunders, the two things you

were referring to in that sentence were the delivery of the packet of information and the need to

find a place for Ms. Saunders, correct?"  Hairston, 3/7/17 a.m. Tr. at 51.  His reply was "[t]hat's

right," which Ms. Saunders argues constituted an acknowledgment that the packet of EEO

documentation was at least a factor in the decision to reassign her.  However, Mr. Hairston was

quite definite that he approved the reassignment of Ms. Saunders to the Faith Based Office on

April 2, 2009, prior to the April 16 delivery of the EEO packet to Ms. Pickett, and basically

played no further role because Administrator Mills was confirmed on April 6.  *See id.* at 89-90.

The exact meaning of his answer, or his understanding of the question, cannot be determined

from the cold record and the Court does not try.  The material points are that his decision to

approve the reassignment was made on April 2, and that by the time Ms. Saunders gave Ms.

Pickett the EEO packet, Mr. Hairston was no longer Acting Administrator and did not play a part

in finalizing Ms. Saunders's reassignment.  Further, if Mr. Hairston's testimony were interpreted

to indicate that the delivery of the EEO packet was "a factor" in the decision to reassign Ms.

Saunders, it would remain insufficient to establish retaliation as a matter of law.  Retaliation

must be proved by traditional but-for causation and evidence of a mixed motive does not satisfy. *See Nassar*, 133 S. Ct. at 2534.

Ms. Saunders further complains that none of the individuals involved in her reassignment took responsibility for the decision. Mr. Avery testified that the decision to reassign Ms. Saunders "would have been made at the top of the organization," because of the position's level and salary, but he did not know who made it. Avery, 3/8/17 a.m. Tr. at 42. Mr. Hairston, who was Acting Administrator, testified that he signed the paperwork for the reassignment on April 2, 2009, based on the recommendation of Mses. Pickett and Ma. Hairston, 3/7/17 a.m. Tr. at 39-40. After April 6, he was no longer Acting Administrator and played no role. *Id.* at 48. Ms. Ma could not remember who initially proposed the new position for Ms. Saunders, stating: "It could have been Penny [Pickett]. It could have been Darryl [Hairston]. It could have been many other folks." Ma, 3/2/17 p.m. Tr. at 47. However, Ms. Ma testified that she, Ms. Pickett, and Mr. Hairston made the decision to select Ms. Saunders for the job "collectively." *Id*. at 48. Ms. Saunders's counsel also entered into evidence a portion of Ms. Ma's sworn deposition in which she stated that Ms. Pickett and Mr. Hairston were responsible for the decision to reassign Ms. Saunders. *Id*. at 49-50. This testimony did not specify the dates involved and therefore does not support Ms. Saunders's theory that her voluntary reassignment became involuntary because of protected activities on April 2 and/or 16, 2009. Its relevance is further undercut by the inescapable fact that the SF-52 was signed by Mr. Hairston and Ms. Ma on April 2, 2009, after Ms. Saunders verbally accepted the new position. For her part, Ms. Pickett denied any knowledge that Ms. Saunders was given a written Notice of Reassignment, testifying only that she heard afterwards that Ms. Saunders had accepted the position. *See* Pickett, 3/2/17 a.m. Tr. at 12.

Ms. Saunders contends that SBA's inability to identify the decision-maker behind her involuntary assignment to the Faith Based Office undercuts the veracity of SBA's non-retaliatory reasons for the reassignment. *See e.g.*, *Sabbrese v. Lowe's Home Centers, Inc.*, 320 F. Supp. 2d 311, 323 (W.D. Pa. 2004) ("[T]hat no one in defendant's upper-level management actually took responsibility for the ultimate decision to discharge plaintiff, however, is circumstantial evidence that supports the inference of causation no less substantially than circumstantial evidence of inconsistent reasons given by an employer for terminating an employee."). The argument misstates the uncontested record. Prior to April 2, 2009, Ms. Pickett had learned, perhaps in error, of Ms. Saunders's background and was eager to have Ms. Saunders accept the job. On April 2, Ms. Ma, as Chief of Staff, and Mr. Hairston, as Acting Administrator, signed the SF-52 paperwork to authorize the new assignment. Shortly thereafter, on April 6, Ms. Mills was confirmed as the new Administrator and Mr. Hairston returned to his official position. Thus, by April 16, when Ms. Saunders delivered a sealed envelope containing documentation on her 2007 EEO activity, Mr. Hairston had ceased to have the role which had vested him, on April 2, with the authority to approve Ms. Saunders's reassignment. The reassignment letter itself was prepared by the Office of Human Capital, after CHCO Avery had advised by email that Ms. Saunders's agreement to the reassignment was not required. *See* Pl.'s Ex. 29B; Pl.'s Ex. 31. The record indicates that the reassignment was finalized during a busy time with changes in management, but it does not support Ms. Saunders's argument that nobody took responsibility. To the contrary, Ms. Pickett testified at length about her reasoning for recommending Ms. Saunders, and Mr. Hairston readily stated that he approved the reassignment on Mses. Pickett's and Ma's recommendation.

Ms. Saunders's effort to focus on the involuntary nature of the reassignment letter, delivered to her on May 4, 2009, misses the mark. First, she overplays the customary language of the notice of reassignment. Its term was "could" lead to termination, not "would." Moreover, Ms. Saunders's desire for a different position, and personal belief she was not qualified, have no bearing on her employer's right to reassign her. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (stressing, in the context of an employee's reassignment, courts' "hesitancy to engage in 'judicial micromanagement of business practices'") (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997)). As Mr. Avery's April 7, 2009 email to Ms. Pickett and Mr. Hairston correctly noted, SBA was within its rights to reassign Ms. Saunders. *See* Pl.'s Ex. 29.[10]

Finally, Ms. Saunders argues that she was reassigned only eighteen days after the second of her two protected activities—that is, her delivery of the EEO packet to Ms. Pickett. The D.C. Circuit has repeatedly held that "temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation." *Allen*, 795 F.3d at 40 (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357-59 (D.C. Cir. 2012)). However, the reassignment was already underway before April 2, 2009, when Ms. Pickett had already begun telling other employees that she had a leading candidate—Ms. Saunders—in mind. The reassignment further, and more definitively, progressed on April 2,

---

[10] The D.C. Circuit has held that an adverse employment action need not entail loss of salary or grade level if "the reassignment left [the employee] with 'significantly different'—and diminished—supervisory and programmatic responsibilities." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). The principle articulated in *Czekalski* is distinguishable here: while the plaintiff in that case was effectively demoted from overseeing almost one thousand employees and contractors and a $400 million budget, Ms. Saunders went from supervising a handful of employees to a job with no supervisory responsibilities but potential for greater responsibilities and visibility in other areas. Most critically, whatever its benefits and deficits, SBA managers decided on April 2 to reassign Ms. Saunders to the new job.

2009, when, immediately after Ms. Saunders admittedly accepted the position, Mr. Hairston and

Ms. Ma signed off on the SF-52. Ms. Saunders's later EEO activity on April 16 cannot

overcome this reality. The Court is persuaded that *Clark County* sets the rule of law here:

SBA's pre-April 2 and pre-April 16 decisions and efforts to recruit Ms. Saunders to the new

position in the Faith Based Office sap her contemporaneous EEO activity on those dates,

concerning legally-stale EEO activity from 2007, of any causative function behind the

reassignment. *See Clark County*, 532 U.S. 268 (holding that plaintiff had failed to establish

causation where a supervisor transferred the plaintiff to a new position before becoming aware

that the plaintiff had filed an EEO lawsuit). *Id.* at 272.[11] Ms. Saunders's memory that she

complained of retaliation on April 2, 2009, is without effect: the determination that she was right

for the Faith Based Office had already been made, and the decision to reassign her was

underway.

The Court concludes that the uncontested facts and the legal precepts of *Clark*

*County* support judgment as a matter of law for the Defendant on Claim Two and denial of Ms.

Saunders's motion for a new trial.

**B. Claim Eight(b) – Decision to Terminate on June 26, 2014**

SBA argues that because the jury found it not liable on Claim Eight(a) (finding

the Notice of Proposed Removal not retaliatory), there was insufficient evidence to support

---

[11] Further, Ms. Saunders also fails to mention any basis to connect her 2007 protected activities
and her 2009 reassignment. It cannot be argued, *sub silentio*, that there is no difference between
managers, that the insult one manager might feel at an EEO charge would necessarily continue
down the line to his unrelated successors, and that the passage of time is irrelevant. The law is to
the contrary. As Ms. Saunders has not disputed or disproved Ms. Pickett's testimony that she
never opened the EEO packet, the proof that the she or Ms. Ma even knew any details of Ms.
Saunders's 2007 EEO activity is also lacking.

liability on Claim Eight(b) (finding Ms. Saunders's termination retaliatory).  *See* JMOL on

Claim 8(b) at 6.  The agency emphasizes that Mr. Christy relied entirely on Ms. Bean's Notice of

Proposed Removal and that there was no evidence to suggest that he had any independent

animus towards Ms. Saunders.  *Id.* at 8.  In fact, argues SBA, Ms. Saunders's theory at trial was

that Ms. Bean's animus towards Ms. Saunders was attributable to Mr. Christy and that he was

not actually in possession of all the facts when he made the final decision to terminate Ms.

Saunders.  *Id.*

        "When a party claims that a jury's verdict is internally inconsistent, the Court has

a special obligation to view the evidence in a manner that reconciles the verdict, if possible."

*Evans v. WMATA*, 816 F. Supp. 2d 27, 32 (D.D.C. 2011) (citing *Hundley v. Dist. of Columbia*,

494 F.3d 1097, 1102 (D.C. Cir. 2007)).  Considering the entire transcript and exhibits, the Court

finds that it can reconcile the jury verdicts on Claim Eight(a) and 8(b).  The jury heard from

multiple witnesses, whom it must have credited, concerning Ms. Saunders's flaws as a

supervisor.  Such evidence supports the verdict in Claim Eight(a) that the Notice of Proposed

Removal was not retaliatory.  Mr. Christy, as a diligent final decision-maker, received more

information and argument from Ms. Saunders and her counsel before he issued the Notice of

Removal.  He identified his role as determining whether to sustain the reasons for Ms. Bean's

proposal but his consideration clearly was broader than the notice of termination.  In addition,

Mr. Christy, unlike Ms. Bean, considered whether to retain Ms. Saunders as an SBA employee

until her retirement date in August 2014, two months later.  He explained his refusal to do so by

very narrowly defining his role and authority.  *See* Christy, 3/21/17 p.m. Tr. at 6-7.  A reasonable

jury could infer that this decision—made by Mr. Christy only—was unreasonable and not fully

explained and, thus, attribute it to Ms. Saunders's protected activity.

Because a reasonable jury would have had a legally sufficient evidentiary basis to find for Ms. Saunders on Claim Eight(b), Fed. R. Civ. P. 50(a)(1), SBA's Motion for Judgment as a Matter of Law as to that claim will be denied.

## IV. CONCLUSION

For the foregoing reasons, SBA's Renewed Judgment as a Matter of Law on Claim Two, Dkt. 150, will be granted and Ms. Saunders's Motion for a New Trial on Claim Two, Dkt. 148, will be denied. SBA's Renewed Judgment as a Matter of Law on Claim Eight(b), Dkt. 155, will be denied.

Date: March 7, 2018

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge